IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD STANLEY, | ) | |
| | ) | CASE NO. 4:13-CV-686 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER** |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 17). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Richard Stanley's applications for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*., and for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.  For the reasons set forth below, the Court AFFIRMS the Commissioner's decision.

## I.  PROCEDURAL HISTORY

Plaintiff Richard Stanley ("Plaintiff" or "Stanley") filed applications for Supplemental Security Income benefits and Disability Insurance benefits on November 30, 2009. (Tr. 131-40). Stanley alleged he became disabled on December 31, 2004 due to suffering from a back injury, high blood pressure, and depression. (Tr. 186).  The Social Security Administration denied Plaintiff's applications on initial review and upon reconsideration. (Tr. 89-98, 101-06).

1

At Stanley's request, administrative law judge ("ALJ") Barbara Sheehe convened an administrative hearing on October 4, 2011 to evaluate his applications. (Tr. 35-64).  Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*).  A vocational expert ("VE"), Ted Macy, also appeared and testified. (*Id.*).  On December 21, 2011, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled. (Tr. 13-29).  After applying the five-step sequential analysis,[1] the ALJ determined Stanley retained the ability to perform work existing in significant numbers in the national economy. (*Id*.).  Subsequently, Plaintiff requested review of the ALJ's decision from the Appeals Council. (Tr. 7).  The Appeals Council denied the request for review, making the ALJ's December 21, 2011 determination the final decision of the

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)     If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)     If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

(3)     If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)     If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)     Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

Commissioner. (Tr. 1-6). Plaintiff now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II. EVIDENCE

### A. Personal Background

Stanely was born on May 3, 1957, and was 47 years old on the date his application was filed and the alleged disability onset date. Plaintiff was 54 years old on the date the ALJ rendered his decision. (Tr. 131). Accordingly, he was considered as a "younger person" for Social Security purposes when the application was filed. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). Plaintiff subsequently changed age category when he turned 50 years old and was considered "closely approaching advanced age." *See* 20 C.F.R. §§ 404.1563(d), 416.963(d). Plaintiff completed the ninth grade and has no past relevant work experience. (Tr. 52, 58-59).

### B. Medical Evidence

#### 1. Physical Impairments

Beginning in 2004, Stanley sought medical treatment for numerous impairments at Forum Health Care's ("Forum Health") medical center. In December 2004 and February 2005, Plaintiff received treatment for external hemorrhoids that caused bleeding. (Tr. 606-07, 612).

Plaintiff presented to Forum Health in July 2006 complaining of headaches, low back pain, and hypertension. (Tr. 276). Stanley's physical examination revealed no significant findings. (Tr. 276). He was prescribed medication for hypertension, which he was given samples of due to lack of insurance. (Tr. 278). Plaintiff returned in September 2006 complaining of headaches. (Tr. 280). He had run out of medication and needed more samples.

In April 2007, Plaintiff reported to Forum Health with back pain, which he asserted was caused by a prior motor vehicle accident. (Tr. 291). There was tenderness in Plaintiff's spine

and pain was elicited on a straight leg raise examination. (Tr. 293).  Stanley was diagnosed with a back sprain and given a prescription of Naproxen. (*Id.*).

During October 2007, Stanley attended a regular follow-up at Forum Health and stated that he had not been taking his blood pressure medication for the past three months.  (Tr. 308).  Despite Plaintiff's expressions of chronic back pain, a physical examination showed a normal range of motion and strength in all extremities, with no joint enlargement or tenderness. (Tr. 310).  Plaintiff was prescribed Tramadol for back pain and referred to a pain clinic. (*Id.*).  A healthcare provider noted Stanley's compliance problems with hypertension medication and advised Stanley to stop tobacco use, which Stanley had been using since age 17. (*Id.*).

On February 7, 2008, Plaintiff complained of a headache and back pain. (Tr. 328).  A provider note indicated Stanley's referral to a pain clinic, but that there appeared to be some issue with insurance, causing Stanley's failure to follow through. (Tr. 330).  In April 2008, Plaintiff reported to Forum Health complaining of headaches three to four times weekly. (Tr. 340, 344).  Plaintiff's provider noted that Plaintiff was not compliant with treatment. (Tr. 344).

In July 2008, the emergency room at St. Elizabeth Hospital diagnosed Plaintiff with gout in his right foot and prescribed Indomethacin and Vicodin, after Plaintiff presented with pain and swelling. (Tr. 352).  Plaintiff followed up with Forum Health on July 14, 2008, and was experiencing less pain and inflammation. (Tr. 351-52).  On August 18, 2008, Plaintiff attended a follow-up at Forum Health and complained of back pain. (Tr. 356-58).  Providers noted the following: Plaintiff's hypertension was uncontrolled due to noncompliance; Plaintiff was taking Ultram for chronic back pain; Plaintiff did not wish to stop smoking; Plaintiff's diagnosis of Hepatitis C; and Plaintiff's gout was controlled and did not require medication. (Tr. 359).

4

On September 22, 2008, Plaintiff visited Forum Health due to issues with gout. (Tr. 359-60).  Earlier in the week, Stanley had presented to St. Elizabeth Hospital due to right knee pain and swelling, and an arthrocenthesis of the knee was positive for gout. (Tr. 362). Plaintiff was prescribed Colchicine. (*Id.*).  Plaintiff's hypertension was uncontrolled, despite his claim that he was taking his medication.  Providers noted Plaintiff's prior lack of compliance and prescribed Metoprolol in addition to Plaintiff's other hypertension medications. (Tr. 360, 362).

In October 2008, providers at Forum Health reported Plaintiff had not taken his medication for hypertension that day and his uncontrolled hypertension was due to noncompliance. (Tr. 364, 367).  Plaintiff indicated chronic back pain. (Tr. 364).  Upon physical examination, Plaintiff had normal alignment and mobility in his spine, and normal range of motion and strength, with no joint issues in his extremities. (Tr. 366).

On November 3, 2008, Plaintiff complained of back pain, which improved with Ultram. (Tr. 368).  Providers recorded Plaintiff's complaints of shortness of breath, advised him to stop smoking, and ordered a chest x-ray. (Tr. 371).  On November 30, 2008, Plaintiff went to the emergency room due to chest pain and shortness of breath. (Tr. 422).  A physical examination showed decreased breath sounds in the left upper lob of the lung and mild wheezing on the anterior left chest wall. (Tr. 423).  Plaintiff was treated for pneumonia. (Tr. 424).

Stanley returned to Forum Health on March 9, 2009, complaining of low back pain that was partially relieved with Ultram.  (Tr. 534).  Plaintiff was referred to physical therapy. (Tr. 537).  In June 2009, Stanley was noted as compliant with diet and medications and experienced no chest pain or leg swelling. (Tr. 544).  He complained of back pain that improved with Ultram. (*Id.*).  Examination showed no rales, rhonich, or wheezes in his lungs. (Tr. 546).

In August of 2009, Forum Health noted Plaintiff was compliant with medication and his blood pressure was controlled. (Tr. 552).  Stanley complained of back pain, indicated Tylenol was unhelpful, and requested a medication refill. (*Id.*).  Plaintiff had not attended physical therapy. (Tr. 556).  Stanley was prescribed Tramadol for back pain. (Tr. 556).  In November 2009, Plaintiff's blood pressure was controlled and he was compliant with medication. (Tr. 562).

December 2009 x-rays and a bone scan revealed lumbar spine facet disease at L4-L5 bilaterally, L5-S1 spondylitic changes, and mild degenerative disc disease to the upper cervical spine. (Tr. 598).  Imaging taken in February 2010 showed mild disc space narrowing and some degenerative changes at L5-S1 and mild facet sclerosis. (Tr. 836).  Dr. Gerald Matteucci found Plaintiff's spine notable for pain palpation along the lumbosacral junction, and recommended facet injections and Tylenol. (Tr. 599).  Plaintiff underwent four facet joint injections from January to February 2010, which he claimed relieved pain for three days. (Tr. 597, 833).

During May 2010, state agency consulting physician Esberdado Villanueva, M.D., conducted a review of the record. (Tr. 966-73).  Dr. Villanueva opined that Stanley could occasionally lift up to 50 pounds; frequently lift up to 25 pounds; stand, sit, or walk for six hours in an eight hour day; never balance; and should avoid hazards, like machinery and heights. (Tr. 967-70).  In September 2010, state agency physician Dianne Manos, M.D., independently reviewed the record and affirmed Dr. Villanueva's report. (Tr. 1042-43).

On May 23, 2011, Stanley was compliant with medications and not experiencing headaches. (Tr. 1070).  He indicated trouble breathing and could not walk more than ten steps without stopping. (*Id.*).  Upon physical examination, Plaintiff's lungs were clear bilaterally to auscultation, but there were decreased breath sounds bilaterally. (Tr. 1073).  Plaintiff had not stopped smoking. (Tr. 1074).  Stanley was referred to a pulmonary clinic for COPD and

6

prescribed inhalers. (*Id.*).  Providers noted a gout flare-up a week prior in Plaintiff's right foot, which was aided by Vicodin and Colchicine. (Tr. 1070).  On July 13, 2011, Plaintiff returned to Forum Health complaining of increased shortness of breath and worsening cough. (Tr. 1065).  He was diagnosed with acute bronchitis and given medication. (Tr. 1068).

On July 27, 2011, Plaintiff was examined at Eastern Ohio Pulmonary Consultants due to COPD symptoms. (Tr. 1100).  Treatment notes reveal that Plaintiff was a long-term smoker, who previously smoked a pack of cigarettes a day and currently smoked half a pack per day. (*Id.*).  A physical examination showed a "rare wheeze at the left [lung] base." (Tr. 1100).  Dr. Lawrence Goldstein diagnosed moderate emphysema and recommended smoking cessation. (Tr. 1101).  He prescribed Prednisone, Spiriva, and a rescue inhaler. (*Id.*).  On August 8, 2011, Dr. Goldstein's notes reflected Plaintiff "has felt much improvement in his symptoms overall and has not reached for a rescue inhaler for the past week.  He feels that his activity tolerance has also improved." (Tr. 1097).  Plaintiff had decreased his cigarette intake, and his lungs were clear without rales, rhonchi, or wheezing.  A spirometry showed a ten percent improvement in pulmonary functional capacity from the same test performed in July. (*Id.*).

### 2.  Mental Impairments

At Forum Health in July 2006, Plaintiff reported depression and previous suicidal ideation. (Tr. 276).  Stanley displayed a flat affect, but no acute distress. (Tr. 276).  He was prescribed Zoloft and given samples due to lack of insurance. (Tr. 278).  Plaintiff returned in September 2006 complaining of worsening depression. (Tr. 280).  He had run out of medication and lost his insurance, but found Zoloft helpful. (*Id.*).  Plaintiff also indicated he was caring for his grandfather and niece, which proved difficult.  Stanley was given sample medication and

referred to psychiatric care at Turning Point Counseling ("Turning Point"). (Tr. 282). In November 2006, Plaintiff was switched from Zoloft to Lexapro. (Tr. 285).

At Forum Health on January 18, 2007, Stanley was tearful with significant mood disturbance. (Tr. 287). He reported frequent suicidal thoughts and having stopped Lexapro one month prior, because he felt it was not helpful. (*Id.*). Thereafter, Stanley was admitted for inpatient psychiatric evaluation, where he reported an attempted overdose on Aspirin, significant depression, and auditory hallucinations. (Tr. 381). On January 22, 2007, he was discharged in stable condition with a diagnosis of major depressive disorder, severe, recurrent, with psychotic features. (Tr. 379-80). Stanley was assigned a Global Assessment of Functioning ("GAF") score of 45, indicating serious symptoms. (*Id.*). He was prescribed Lexapro, started on Abilify and Ambien, and instructed to follow-up with Turning Point. (Tr. 380). In April and October 2007 at Forum Health, Plaintiff reported improved mood and denied suicidal ideation. (Tr. 291, 308).

On February 18, 2008, Plaintiff was admitted to the emergency room after overdosing on Norvasc, consuming half a pint of gin, and inhaling cocaine. (Tr. 394). Plaintiff felt overwhelmed with the responsibility of taking care of his niece and heard voices instructing him to commit suicide. (*Id.*). Providers questioned whether Plaintiff was compliant with medication. (Tr. 394-95). Upon discharged on February 20, 2008, Plaintiff was advised to follow-up with Turning Point. (Tr. 403-04).

In August of 2009, Forum Health noted Plaintiff became depressed due to personal problems, but was not experiencing suicidal ideation. (Tr. 552). Stanley's prescription for Lexapro was changed to a generic brand, which was covered by his insurance. (Tr. 560).

In October 2009, Plaintiff commenced mental health treatment at Turning Point. (Tr. 625). During a diagnostic assessment, an intake examiner described Stanley as well groomed

8

with average eye contact and speech. (Tr. 638). She also noted mild racing thoughts, some insight, poor judgment, a moderately depressed mood, severe auditory hallucinations, and a moderately constricted affect. (*Id.*). Plaintiff was assigned a GAF score of 55, indicating moderate symptoms. (Tr. 635). His diagnoses were schizoaffective disorder (depressive type) and alcohol abuse. (Tr. 635). Through August 2011, Plaintiff continued a course of what appears to be medication management at Turning Point. (Tr. 641-47, 996-1027).

State agency examiner Donald Degli, M.A., performed a consultative examination of Plaintiff on April 9, 2010. (Tr. 661-66). Plaintiff reported diagnoses of depression and bipolar disorder, and that he had been taking Trazedone, Lithium, Abilify, and Celexa. (Tr. 663). During the examination, Plaintiff had good eye contact, his speech was not pressured, he provided detailed and relevant information, and he did not evidence a thought disorder or attention difficulties. (*Id.*). Mr. Degli noted mild anxiety and depression. (*Id.*). Plaintiff explained that he managed all of the household chores, watched television, drank a six pack of beer and consumed half a pack of cigarettes daily, visited his godmother, and enjoyed fishing. (Tr. 664). Mr. Degli noted that, "[i]n a way, Richard is beginning to vegetate in his daily functioning." (*Id.*). The psychologist diagnosed depressive disorder, a learning disorder, and borderline intellectual functioning, with a GAF score of 55. (Tr. 665). The report concluded that Plaintiff was moderately impaired in interacting with peers, supervisors, or the public; following directions or performing routine tasks for meaningful periods; maintaining attention, concentration, persistence, and pace; and withstanding stress and pressure in the workplace. (*Id.*).

On November 5, 2009, Plaintiff returned to Turning Point where his diagnosis was adjusted to mood disorder, ruling out a diagnosis of bipolar disorder. (Tr. 641). Stanley's

9

mental status examination indicated he was moderately depressed, with a moderately constricted affect, mild impulsivity, mildly withdrawn, and cooperative. (*Id.*).

At Turning Point on March 25, 2010, Plaintiff reported depressive feelings, crying, and auditory hallucinations. (Tr. 1009-10).  While Stanley appeared dysphoric and his affect was depressed, he was alert; had normal speech; displayed a logical thought process; was non-delusional; denied suicidal thoughts; was cooperative; and had adequate insight, judgment, and cognition. (Tr. 1009).  During July 2010, Plaintiff stated he was cut off of welfare and was having suicidal thoughts without a plan. (Tr. 1005-06).  He felt his medication was not helping. (Tr. 1005).  Aside from a dysphoric mood, Plaintiff's mental status examination was insignificant. (*Id.*).  Stanley reported less suicidal thoughts in August 2010 after starting Lithium. (Tr. 1003-04).  He appeared alert and euthymic. (Tr. 1003).

Plaintiff underwent a second one-time consultative examination with Kenneth Gruenfeld, Psy.D., on September 15, 2010. (Tr. 1045-49). Stanley reported a history of depression, manic episodes, and auditory hallucinations. (Tr. 1046).  Plaintiff indicated that his cognitive functioning did not impact his ability "to pay his bills, conduct complicated household chores that require several steps to achieve, and manage his medical issues independently." (*Id.*). Stanley also stated that he could use the bank, drive, and travel on public transportation, though mental health issues impacted his motivation to do so. (*Id.*).  During the exam, Stanley's task motivation, persistence, concentration, and response to directions were good. (*Id.*).  Plaintiff's conversation was logical with some spontaneous elaboration, and his affect was appropriate, though he appeared depressed and anxious. (Tr. 1047).

Dr. Gruenfeld assigned a GAF score of 60 for functioning and a current GAF score of 55. (Tr. 1048-49).  He opined that Plaintiff had moderate limitations in the areas of relating to others;

maintaining attention, concentration, persistence, and pace; and withstanding stress and pressure associated with day-to-day work.  Stanley had no impairment in his ability to understand and follow simple and undetailed instructions. (*Id.*).

On May 7, 2010, state agency physician Carl Tishler, Ph.D., conducted a review of Plaintiff's record to assessed his abilities. (Tr. 948-65).  Dr. Tishler opined that Plaintiff could perform simple routine tasks in a setting with regular expectations, occasional intermittent interactions with others, and few changes. (Tr. 951).  On September 27, 2010, Vicki Warren, Ph.D., conducted a review of the updated record and affirmed Dr. Tishler's opinion. (Tr. 1050).

On May 24, 2011, Turning Point providers noted increased mood liability and auditory hallucinations, but observed that Plaintiff had run out of medication over a month before his visit. (Tr. 1059, 1061-62).  Plaintiff displayed a fragmented thought process and racing thoughts, but remained well-oriented. (Tr. 1061).  Stanley's medication was adjusted and he was instructed to decrease alcohol use. (Tr. 1062).   At Turning Point on June 28, 2011, Stanley stated that he had run out of medication four to five days before the visit. (Tr. 1057-58).   Plaintiff had a negative thought process, was overwhelmed, and indicated constant auditory hallucinations. (Tr. 1057).  Stanley's diagnosis was adjusted to schizoaffective disorder, bipolar type. (Tr. 1058).

By his July 28, 2011 Turning Point session, Stanley reported feeling better and less paranoia, though he was "still edgy." (Tr. 1082-83).  A mental status examination showed Plaintiff's thoughts were focused on his health and mood was responsive.  Additionally, he denied suicidal ideation, was well-oriented, and had fair insight. (Tr. 1082).  On August 25, 2011, Plaintiff reported feeling better on medication and was well, aside from an outburst earlier in the week. (Tr. 1080-81).  Stanley was goal-oriented and his mood was responding. (Tr. 1080).

11

In August 2011 Cynthia Paschal-Pulliam, C.R.N.P., of Turning Point completed a medical statement as to Plaintiff's mental abilities. (Tr. 1078-79). The assessment was co-signed by psychiatrist Brian Sullivan, M.D. Ms. Paschal-Pulliam indicated that Stanley suffered from numerous moderate, marked, and extreme limitations. (Tr. 1079). The pair submitted a second statement on October 25, 2011 asserting that Plaintiff had made some progress, but would still be significantly mentally ill even if he were unable to obtain drugs of abuse or alcohol. (Tr. 1106).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2008.

2. The claimant has not engaged in substantial gainful activity since December 31, 2004, the alleged onset date.

3. The claimant has the following severe impairments: seizure disorder; gout, not otherwise specified ("NOS"); Hepatitis C; hypertension; hemorrhoids; mild degenerative disc disease of the cervical spine; lumbar facet disease and spondylosis; chronic obstructive pulmonary disease ("COPD"); affective disorders, variously diagnosed as schizoaffective disorder, major depressive disorder, bipolar disorder, and mood disorder, NOS; learning disorder and borderline intellectual functioning ("BIF"); and alcohol abuse.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b)—including the exertional abilities to lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently, to push and/or pull within those same weight limitations, and to sit, stand, and walk each for a total of about 6 hours during the course of an 8-hour workday—except that he is further limited as follows:

   - Can never climb ladders, ropes, or scaffolds but can occasionally climb stairs and ramps;
   - Should avoid all exposure to workplace hazards, such as unprotected heights or dangerous machinery;
   - Is further limited to tasks that are simple, routine, and repetitive, which can be learned in 30 days or less;

12

- Which involve limited and superficial interaction with supervisors, co-workers, and the public; and
- Is limited to "low-stress" work, defined as precluding tasks that involve high production quotas (such as piecework or assembly line work), strict time requirements, arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others.

6. The claimant has no past relevant work.

7. The claimant was born on May 3, 1957 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability date. The claimant subsequently changed age category to closely approaching advanced age.

8. The claimant has a marginal education and is able to communicate in English.

9. Transferability of job skills is not an issue because the claimant does not have past relevant work.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2004, through the date of this decision.

(Tr. 15-29) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## V. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial

13

evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI. ANALYSIS

On appeal, Plaintiff argues that the ALJ erroneously assessed his credibility and remand is necessary for a more appropriate evaluation. It is the ALJ's responsibility to make decisions regarding the credibility of witnesses, and the ALJ's credibility determinations are entitled to considerable deference. *See Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). "An ALJ's

14

findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the] ALJ is charged with the duty of observing a witness's demeanor and credibility." *Id*. Notwithstanding, the ALJ's credibility finding must be supported by substantial evidence, *Walters*, 127 F.3d at 531, as the ALJ is "not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.' " *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (*quoting* SSR 96-7p).

In evaluating whether a claimant is disabled by pain, this circuit has established a two part test. *Rogers*, 486 F.3d at 243. The ALJ must consider (1) whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objectively established medical condition is of a level of severity that it can reasonably be expected to produce the claimant's alleged symptoms. *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994).

When evaluating the credibility of a plaintiff's allegations of pain, the ALJ should consider a number of factors in addition to the objective medical evidence. *Walters*, 127 F.3d at 531; 20 C.F.R. § 404.1529(c)(2). These other factors may include: statements from the claimant and the claimant's treating and examining physicians; diagnoses; efforts to work; the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; treatment, other than medication, the claimant receives to relieve pain; measures used by the claimant to relieve symptoms; and any other factors concerning functional limitations due to symptoms. *See Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); 20 C.F.R. §§ 404.1529(a), (c)(3); SSR 96-7p, 1996 WL 374186, at *3.

Here, Plaintiff asserts that the ALJ failed to provide any reason for discrediting his credibility.  Plaintiff's argument is not well taken.  The ALJ's decision discusses the standard to be followed in the credibility assessment. (Tr. 20).  The ALJ applied the Circuit's two-step test for assessing credibility, finding that Stanley's statements regarding the intensity, persistence, and limiting effects of his symptoms were not fully credible. (Tr. 21).  It is true that the ALJ's reasons for devaluing Plaintiff's statements were not restricted to a concise credibility analysis section within his opinion.  Nonetheless, the ALJ's decision thoroughly summarized Stanley's articulations of pain and other symptoms. (Tr. 20-21).  After providing this summary, the ALJ methodically evaluated each major component of Plaintiff's alleged physical and mental impairments, including hypertension, gout, back impairments, and various mental health impairments. (Tr. 21-26).  In that process, the ALJ analyzed relevant evidence and gave reasons, which will be further discussed herein, for why Plaintiff's statements were not fully credible. The ALJ supported his analysis with specific citations to the record.

Additionally, Stanley maintains that the ALJ failed to discuss the credibility factors set forth by the regulations.  However, the regulations do not mandate a discussion of all of the relevant credibility factors; an ALJ may satisfy his obligations by considering most, if not all, of the factors. *See Bowman v. Chater*, 132 F.3d 32 (Table), 1997 WL 764419, at *4 (6th Cir. Nov. 26, 1997) (per curiam).  Here, a review of the ALJ's decision shows that the ALJ considered and evaluated most of the applicable factors set forth by the regulations.

For example, the ALJ summarized, in great detail, the statements Plaintiff provided in his applications for benefits and during the administrative hearing. (Tr. 20-21).  The ALJ acknowledged that Plaintiff indicated he suffered from high blood pressure accompanied by severe headaches; daily back pain; and depression which interferes with his concentration and

16

memory, causes frequent suicidal thoughts, and prompts changes in mood. (Tr. 20).  The ALJ

also recounted that:

> At the hearing in this matter, the claimant testified that he hears voices in his head on a daily basis, which has caused him not to want to be around people and, at least twice a week, not get out of bed.  He described a male voice constantly present throughout the day that instructs him to harm himself, take more pills than safely prescribed, and do other things.  Multiple side effects were identified in his testimony, consistent with the written statements, for tremors, particularly of the right hand, dizziness, and fatigue.  The claimant further testified that he cannot concentrate or focus on one thing at a time, has daily crying spells without any identifiable reason, and almost daily suicidal thoughts.
>
> With respect to the medical conditions that prevent him from working, the claimant listed in his testimony high blood pressure, gout, and chronic muscle spasms in his back.  He described the high blood pressure as uncontrolled even with medication and accompanied by severe headaches occurring twice a week and each lasting several hours, nosebleeds, and frequent trips to the restroom throughout the day (the last, a side effect of his medications).  The claimant testified he has gout in his feet and sometimes in the knee with fluid collection that required drainage, with severe flare-ups occurring every couple of months and lasting a full week.  He further testified that he has lower back pain with muscle spasms four times a week, which causes difficulties in descending steps, sitting for more than ten minutes, standing for more than ten to fifteen minutes, walking for more than five minutes, and lifting/carrying more than ten pounds. He said that he has not received treatment for Hepatitis C, although he would be submitting for blood work after the hearing.  He is on several inhalers for his COPD, but said that he cannot climb steps without getting out of breath.  The claimant rated his average pain level at "8" (on an increasing severity scale of "1 to 10"), and he said that he lies down to relieve his pain.

(Tr. 21).  The ALJ went on to consider additional credibility factors and pointed to evidence that

called into question the severity of Plaintiff's allegations of pain and other symptoms.

For instance, contrary to Plaintiff's allegations of a disabling breathing disorder, the ALJ

noted that the majority of clinical examinations showed Plaintiff's lungs were clear without

wheezes, rales, or rhonchi. (Tr. 22, 325).  The ALJ observed that Plaintiff's lungs remained, for

the most part, clear, even after Plaintiff's COPD diagnosis around 2011. (Tr. 22, 1067, 1073).

Moreover, the ALJ assessed Plaintiff's July 2011 pulmonary consultation, which described chest

x-rays showing clear lungs, with only a rare wheeze in the left lung based. (Tr. 22, 1100). During this consultation, Plaintiff was diagnosed with "moderate emphysema." (*Id.*). As the ALJ explained, twelve days after the consultation and treatment, Plaintiff reported "much improvement" in his symptoms and improved activity tolerance. (Tr. 22, 1097). Additionally, Stanley's chest displayed normal respiratory effort, his lungs were clear, and his pulmonary functional capacity had increased by ten percent, evidencing the effectiveness of the prescribed inhalers and steroid. (*Id.*). Based on the foregoing evidence, the ALJ did not credit Plaintiff's claim that he was experiencing such severe breathing problems as to render him disabled.

The ALJ also acknowledged Plaintiff's allegation that he experienced severe headaches twice weekly, associated with high blood pressure and hypertension. (Tr. 21, 23). Undermining the frequency with which Stanley alleged his headaches occurred, the ALJ observed that when compared to the lengthy period of time for which Stanley received medical treatment, Plaintiff's complaints of headaches to medical providers were not significantly frequent. (Tr. 23). The ALJ also pointed to treatment notes from Forum Health, which frequently mentioned Plaintiff's noncompliance with hypertension medication that was often provided for free. (Tr. 23). Moreover, despite Stanley's claim of uncontrolled blood pressure, the ALJ observed that records showed Stanley's blood pressure was generally normal when he complied with medication. (Tr. 23, 542, 552).

Additionally, the ALJ addressed Stanley's allegedly disabling back pain and muscle spasms, which Stanley purported severely restricted his ability to sit, stand, walk, and lift/carry. (Tr. 21, 22). Despite Plaintiff's serious complaints, the ALJ described Plaintiff's medical care, which was limited to conservative treatment, primarily in the form of medication management and facet injections. (Tr. 22). Although the ALJ noted Stanley's statements that facet injections

18

were not effective (Tr. 22, 23), the ALJ also pointed to x-rays which showed generally mild abnormalities in Plaintiff's spine. (Tr. 23, 836).  Additionally, the ALJ observed that while Plaintiff's physical examinations showed some "positive tenderness to palpation in the lumbar spinous processes and flanks" (Tr. 22), they also regularly revealed no issues with extremities, intact neurological findings and gross motor strength, and a normal gait. (Tr. 23, 354, 366, 835, 844).

As to gout, Plaintiff testified that he experienced flare-ups every few months that lasted a few weeks and required medical attention. (Tr. 21).  However, the ALJ concluded that the evidence was inconsistent with these allegations. "Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." *Rogers*, 486 at 247-48.  As the ALJ explained, aside from 2008, "the evidence is devoid of any further significant flare-ups of gout that prompted emergent medical treatment, much less to the frequency and duration alleged by the claimant at the hearing." (Tr. 23).  The record shows that Plaintiff treated for gout in July and September 2008, and thereafter, it does not appear as though he experienced major flare-ups, other than a minor incident around May 2011.  (Tr. 352, 362).

The ALJ also described Plaintiff's averments of auditory hallucinations, daily suicidal thoughts, and daily crying spells. (Tr. 21).  One reason the ALJ provided for questioning the severity of Plaintiff's mental impairments was Plaintiff's lack of formal mental health treatment. (Tr. 24).  The ALJ pointed out that beyond two hospitalizations prompted by suicide attempts, from 2005 until October 2009, Plaintiff did not pursue formal mental health treatment. (Tr. 24, 625).  Despite multiple recommendations from Forum Health and Plaintiff's allegations of severe symptoms, it is unclear why Plaintiff did not pursue mental health treatment with Turning

Point until October 2009. As the ALJ explained, "[t]his establishes that he did have temporary exacerbations of serious mental symptoms but that those issues were promptly resolved by medications, such that the antidepressant medication prescribed by his treating physicians afforded adequate control of his symptoms for nearly five years of the period at issue." (Tr. 24). The ALJ also cited to times when Stanley presented to Forum Health reporting improved mood and denying suicidal thoughts. (Tr. 24, 308, 340). The ALJ noted that during Stanley's initial evaluation at Turning Point, he was assigned a GAF score of 55, representing only moderate symptoms. (Tr. 24, 635).

Furthermore, the ALJ observed that medication improved symptoms stemming from Plaintiff's mental impairments. (Tr. 24). The ALJ explained that when Plaintiff's symptoms worsened in May and June 2011, Plaintiff had not been taking medication. (Tr. 24-25, 1059-62, 1057-58). In contrast, when Plaintiff resumed medication in July and August 2011, Plaintiff felt better and was less paranoid, and mental health care providers described him as responding to treatment. (Tr. 25, 1080-83). The ALJ concluded that even with treatment, Plaintiff experienced symptoms of affective and mood disorders, but given the evidence, these disorders did not limit Plaintiff to the extent he professed. (Tr. 25).

Thus, while accounting for a number of relevant credibility factors, the ALJ provided reasons for discounting Plaintiff's credibility. The ALJ addressed the location, duration, and frequency of Plaintiff's symptoms; statements from Plaintiff's healthcare providers; medication and its effectiveness; treatment other than medication; and other factors that concerned Plaintiff's symptoms. To the extent that Stanley contends the ALJ failed to assess his credibility in light of the relevant factors or give reasons for discounting his credibility, these assignments of error lack merit.

Additionally, Plaintiff cites to *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) for the proposition that an ALJ cannot reject allegations of disabling pain and symptoms based on medical evidence alone.  However, here the ALJ looked beyond objective medical evidence.  As previously explained, the ALJ addressed Plaintiff's subjective allegations, the longitudinal course of Plaintiff's treatment, Plaintiff's compliance, and the medications Plaintiff was prescribed. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d at 248.  Viewed as a whole, the ALJ's decision does not discount Plaintiff's credibility in light of only objective medical evidence.  As he was required to, the ALJ balanced Plaintiff's subjective allegations of pain and limitations with the weight of the medical evidence in making his decision.  *See, e.g., Black v. Comm'r of Soc. Sec.*, No. 3:09-CV-1997, 2010 WL 5129287 (N.D. Ohio Dec. 10, 2010).  Accordingly, remand is not appropriate.

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the Court AFFIRMS the decision of the Commissioner.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: May 30, 2014.

21